UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

CIVIL ACTION NO. 15-9-DLB-HAI

RODNEY STEVENS, et al.                                             PLAINTIFFS

V.                            MEMORANDUM OPINION AND ORDER

GREG SPECK, et al.                                                 DEFENDANTS

                         ***   ***   ***   ***

## I.    INTRODUCTION

Defendants Greg Speck and David Moss were elected Sheriff and Jailer, respectively, in the 2014 local elections in Pulaski County. When they took office, Defendants fired or refused to rehire Plaintiffs, former employees Rodney Stevens, Richard Maxey, and Amy Raleigh. Plaintiffs had supported Defendants' opponents in the elections for Sheriff and Jailer. Plaintiffs brought this § 1983 action alleging that their separations from employment were in violation of the First and Fourteenth Amendments. Defendants moved for summary judgment on the claims of Amy Raleigh (Doc. # 23) and Richard Maxey and Rodney Stevens (Doc. # 24).[1]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.    Jailer Election and Plaintiff Amy Raleigh's Termination

In the primary election for Jailer in May 2014, Defendant David Moss ran against

---

1    Plaintiffs also allege that their separation from employment is actionable as wrongful discharge under state law because it violates Kentucky public policy. (Doc. # 1 at ¶ 20). Defendants do not move for summary judgment on those claims, so the Court will not address them.

incumbent Jailer Mike Harris, Plaintiff Rodney Stevens, and six other candidates. (Doc. # 38-1 at 32; Doc. # 36-1 at 23). Raleigh supported Harris in the primary, and introduced herself to Moss at an event while wearing a "red elect Mike Harris shirt." (Doc. # 38-2 at 52-53; Doc. # 38-1 at 18-19). Moss won the primary, and Plaintiff Rodney Stevens challenged him as a write-in candidate in the general election. (Doc. # 36-1 at 23). Raleigh supported Stevens, who lost to Moss. (Doc. # 38-2 at 60; Doc. # 23-3 at ¶ 1). Newly elected Jailer Moss terminated Raleigh on January 5, 2015, when he took office. (Doc. # 38-2 at 98-99; Doc. # 44-2 at 69; Doc. # 33-1 at 11-12). Jailer Moss did not provide Raleigh with reasons for her termination. (*Id.*)

Plaintiff Amy Raleigh started working full-time at the Pulaski County Detention Center in 2011. (Doc. # 38-1 at 10). She became the jail's fiscal account manager later that year. (*Id.* at 13). As the fiscal account manager, Raleigh "did all the billing," including "the state and federal billing," "helped balance all the inmate accounts," and had "a lot of duties" that "came and went." (Doc. # 38-4 at 173). According to Pulaski County's description of the fiscal account manager position, her duties included "prepar[ing] and maintain[ing] the financial records, budget, inventories, accounts payable, accounts receivable, commissary accounts and other financial reports" for the jail. (Doc. # 23-17). The fiscal account manager is a "[s]worn officer[] with the power to arrest" whose [w]ork is performed under the Jailer." (*Id.*) The Jailer is a constitutional officer of the county who operates the jail and is elected every four years. KY. CONST. § 99. The fiscal account manager also "[a]ssist[s] the Jailer, Major and Captain with other day to day duties needing to be completed," which could include "[p]erform[ing] supervision, care and control of inmates when called upon." (Doc. # 23-17).

As Jailer-elect, Moss attended a jailers' conference in December 2014 that Raleigh and other jail employees also attended. (Doc. # 23-3 at ¶ 3). Moss observed jail personnel following Raleigh's example or instructions to leave the training sessions early, and he believed that Raleigh was in a position of power over the other employees. (*Id.* at ¶ 8). Moss also claims he was informed that Raleigh instructed jail personnel to falsify their training certifications by marking them as complete, even though they left early. (*Id.* at ¶ 12). Based on what he observed, Jailer Moss alleges that Raleigh falsified her own training attendance records. (*Id.* at ¶ 13). Raleigh disputes Moss's observations. She maintains that the training is not required, that it is up to each individual to decide how much of the session to attend, and that she did not falsify her training records. (Doc. # 38-3 at 139-42).

Before he officially took office, Moss interviewed Raleigh. (Doc. # 23-3 at ¶ 10). Moss also interviewed four other Harris supporters–one was fired, one retired, and two were retained. (Doc. # 38-1 at 32-34; Doc. # 23-9; Doc. # 35-3 at 109). Based on statements she made at the interview, Moss believed that Raleigh was in a position of policymaking and confidence with broad policymaking authority at the jail. (*Id.* at ¶ 17). Raleigh claims that although she gave input when asked, she does not make policy and is not in a supervisory position. (Doc. # 38-1 at 43; Doc. # 38-2 at 81-82). Moss claims he fired Raleigh because he did not believe he could trust her, she contributed to poor morale among jail personnel, and she ran the jail poorly when power was delegated to her. (Doc. # 23-3 at ¶ 19). Raleigh alleges she was fired as retaliation for her support of Jailer Moss's opponents, Harris and Stevens. (Doc. # 38-1 at 18, 20).

**B.     Sheriff Election and Refusal To Rehire Plaintiffs Rodney Stevens and Richard Maxey**

Defendant Speck ran for Sheriff against incumbent Sheriff Todd Wood in the 2014 primary.  (Doc. # 37-1 at 33-34; Doc. # 33 at 6-7).  Speck defeated Wood and ran unopposed in the general election.  (Doc. # 24-4 at ¶ 1).  During the campaign, Speck and Moss often appeared at events together, standing next to each other and shaking hands with members of the crowd together.  (Doc. # 36-1 at 36-37; Doc. # 38-1 at 47-49).  Moss was a Speck supporter, and they had their campaign victory parties in the same place. (Doc. # 35-3 at 104, 107).  After the general election, Speck required all full-time Sheriff's Department personnel to re-apply and interview before he rehired them.  (Doc. # 24-4 at ¶ 3).  Speck refused to rehire Plaintiffs Stevens and Maxey.  (Doc. # 24-4 at ¶¶ 13, 23).

Plaintiff Stevens was a narcotics detective at the Sheriff's Department for seventeen years.  (Doc. # 36-2 at 91).  He supported Wood in the 2014 primary election.  (*Id.* at 86-87).  Stevens also ran for Jailer in the primary against Moss, Harris, and six others.  (Doc. # 36-1 at 22-23).  Moss defeated Stevens in the primary, but Stevens continued as a write-in candidate in the general election.  (Doc. # 23-3 at ¶ 1).  After he lost, Stevens re-applied for his position as a narcotics detective.  (*Id.* at ¶ 5).  During the interview process, Speck learned that the Kentucky State Police had an open investigation into Stevens, regarding allegations of extorting money, free labor, and materials from a drug dealer.  (*Id.* at ¶ 16).  He also learned that the federal Drug Enforcement Administration had significant problems with Stevens's prior work as a detective, including allegations that he sabotaged or interfered with investigations.  (*Id.*)  Stevens claims he is unaware of any of these allegations.  (Doc. # 36-1 at 45-47).  Chief Deputy Hancock told Speck that Stevens had

been a student in Hancock's criminal justice training classes, and that based on his experience, Stevens would not be a good officer. (*Id.* at ¶ 21). As a result of this information and Stevens's interview, Speck thought Stevens was untrustworthy, bad at his job, would not follow protocol with informants or offenders, had difficulty working with other law enforcement agents, and "was not the caliber of candidate [he] wanted to work with as part of the Sheriff's Office." (Doc. # 24-4 at ¶ 22). Stevens counters that his cases are used as examples in Hancock's training, that he has many years of experience, and that he has received compliments from the public on his work. (Doc. # 36-2 at 54-55, 58, 64). Stevens was not rehired, and his employment was terminated on December 31, 2014. (Doc. # 36-1 at 10-11). Stevens believes he was retaliated against for his support of incumbent Sheriff Wood and for running against Jailer Moss, Speck's political ally.

Richard Maxey worked for the Sheriff's Department as a court security officer, becoming a full-time employee in September of 2014. (Doc. # 37-1 at 12). At that time, he worked as a bailiff for Pulaski County Family Court. (*Id.* at 14). In his previous employment, Maxey had allegations of misconduct. He had resigned from work at a previous employer because of a sexual harassment complaint. (*Id.* at 45). In addition, during his time with the Somerset Police Department, he was suspended for two weeks without pay for using the women's bathroom and denying it. (*Id.* at 43-44). Maxey had no other disciplinary problems at the Somerset Police Department, and left to get a higher-paying job at the Pulaski County Sheriff's Department. (*Id.* at 45). He had no history of disciplinary issues at the Sheriff's Department. (*Id.*) Maxey supported incumbent Sheriff Wood in the primary and was not rehired when Sheriff Speck took office. (*Id.* at 37; Doc. # 37-2 at 63). Maxey claims Speck retaliated against him for supporting his opponent.

III.    **ANALYSIS**

A.    **Standard of Review**

Summary judgment is appropriate when there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the Court that there are no disputed material facts and that she is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

B.    **Plaintiffs' Constitutional Claims Against Defendant Speck and Defendant Moss**

Plaintiffs have brought constitutional claims under 42 U.S.C. § 1983 against Defendant Speck and Defendant Moss, in their individual capacities.[2]  Plaintiffs Stevens and Maxey have sued Defendant Speck, alleging First Amendment retaliation.  Plaintiff Raleigh has sued Defendant Moss, alleging he retaliated against her in violation of the First

---

2    Plaintiffs have also sued Defendants Jailer Moss and Sheriff Speck in their official capacities.  These official capacity claims are construed as claims against Pulaski County itself.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *see also Baar v. Jefferson Cty. Bd. of Educ.*, 476 F. App'x 621, 635 (6th Cir. 2012).  Accordingly, those official capacity claims will be considered in conjunction with the Plaintiffs' claims against the Pulaski County Fiscal Court.

Amendment and terminated in violation of her Fourteenth Amendment procedural due process rights.

### 1. Plaintiff Raleigh's Fourteenth Amendment Claim

Raleigh alleges that her procedural due process rights were violated when Jailer Moss terminated her. Procedural due process claims require a two-step analysis. *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004). First, the Court must determine "whether the alleged deprivation is within the ambit of the Fourteenth Amendment's protection of liberty and property." *Shoemaker v. City of Howell*, 795 F.3d 553, 558-59 (6th Cir. 2015). Second, if the plaintiff does have a protected interest, the Court must determine how much process was due, *Mitchell*, 375 F.3d at 480, and whether the plaintiff was "afforded adequate process prior to and following the deprivation," *Shoemaker*, 795 F.3d at 559.

### a. Property Interest

Raleigh's § 1983 procedural due process claim survives because she has a property right in her continued employment. Property interests "are not created by the Constitution," but rather "by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). These "existing rules or understandings" must give the recipient "a legitimate claim of entitlement to" the benefit to be a protected property interest. *Id.* That property interest can be created by "a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004).

There is a state statute that governs the hiring and removal of jail personnel, Ky. Rev. Stat. Ann. § 71.060(2). That statute provides that "[t]he jailer shall be responsible for the appointment and removal of jail personnel, and the jailer may dismiss his deputies at

any time with cause." Ky. Rev. Stat. Ann. § 71.060(2). A "with cause" limitation on a public employer's ability to dismiss its employees creates a property interest in continued employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985).

The parties agree that Raleigh's title when she was terminated was "fiscal account manager." (Doc. # 38-1 at 13, 14). In addition, Raleigh alleges in her Complaint, and Defendants admit in their Answer, that "Amy Raleigh worked as a deputy jailer." (Doc. # 1 at ¶ 7; Doc. # 10 at ¶ 7). Raleigh claims that all employees at the Pulaski County Jail are deputy jailers "along with whatever other job title they may hold." (Doc. # 45 at 28). Defendants do not contest that Pulaski County Jail employees are deputy jailers, but reiterate that the job description states she is a fiscal account manager, not a deputy. Defendants having admitted Raleigh's status as a deputy jailer in their Answer, and failed to rebut Raleigh's testimony that all Pulaski County Jail employees are deputies in addition to their other titles, the Court finds that she is a deputy jailer and thus has a property interest under Ky. Rev. Stat. Ann. § 71.060(2) because she may only be terminated with cause.[3]

### b.      Pre-termination Hearing

Defendants argue that, even if Raleigh had a property interest in her continued employment, she received all the process due in her pre-termination interview. The Sixth Circuit has "held that prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence,

---

3      Because the Court finds Raleigh has a property interest in continued employment pursuant to Ky. Rev. Stat. Ann. § 71.060(2), the Court need not consider whether the Fiscal Court's policies and procedure manual can be construed as an implied contract.

and an opportunity to present his or her side of the story to the employer.'" *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (quoting *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir. 1990)). "Affording an employee the opportunity to respond after being confronted with the charges" is a critical element of the pre-termination process. *Buckner*, 901 F.2d at 495-96.

Moss claims that he provided Raleigh all the process due when he interviewed her because she "knew her performance and the operation of [the] jail was at issue during the interview." (Doc. # 23-1 at 22-23). Moss also claims that he "provided Raleigh with numerous opportunities to explain issues with the Jail's operation and her role–including issues with low morale at the Jail." (*Id.*) In particular, Moss states in his affidavit that he terminated Raleigh because he "did not believe [he] could trust her, she contributed to poor morale among jail personnel, and she ran the jail poorly when power was delegated to her by the previous administration." (Doc. # 23-3 at ¶ 19). Moss based this decision on his "interviews of other jail personnel, Amy Raleigh's interview, her behavior at the conference, and [her] certification of training from the conference." (*Id.* at ¶ 18).

But providing Raleigh with opportunities to discuss her performance is not the same as providing the required notice of the charges, explanation of evidence, and an opportunity to respond. *See Farhat*, 370 F.3d at 595. Moss does not point to any evidence in the record to suggest he provided Raleigh notice of the charges against her, and Raleigh claims she was not made aware of concerns about her training attendance. (Doc. # 38-1 at 46). Without notice and evidence of the charges against her, Raleigh had no meaningful opportunity to respond, and Defendants cannot show as a matter of law that the requirement of a pre-termination hearing was satisfied.

Defendants argue that they are entitled to summary judgment because Raleigh waived her procedural due process claim when she failed to take advantage of post-termination procedures. But failure to use post-termination procedures does not waive a due process claim where the pre-termination procedures are constitutionally inadequate. *Farhat*, 370 F.3d at 595 ("For public employees who can only be fired for cause, the Supreme Court has held, specifically, that a pre-termination proceeding is required. . . . [P]rior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer.'" (quoting *Buckner*, 901 F.2d at 494)); *see also id.* at 596-97 (holding that failure to participate in post-termination proceedings waives a due process claim where plaintiff "was given pretermination notice and an opportunity to be heard"). Here, Defendants have not shown that the pre-termination proceedings provided Raleigh notice, reasons, and an opportunity to respond. As a result, Defendants are not entitled to summary judgment on Raleigh's procedural due process claim.

### 2. Plaintiffs Stevens's and Maxey's Fourteenth Amendment Claim

Plaintiffs Stevens and Maxey offered no response to Defendants' Motion for Summary Judgment on their Fourteenth Amendment due process claims. Accordingly, Defendants' Motion will be granted.[4]

---

[4] The Court notes that, even if Stevens and Maxey had responded to Defendants' Motion, their claims would fail. Maxey, as a certified court security officer, is removable at will. Ky. Rev. Stat. Ann. § 70.030(2) (sheriff "may appoint his or her own certified court security officers and may revoke the appointment at his or her pleasure"). Stevens, as a sheriff's deputy, is also removable at will. Ky. Rev. Stat. Ann. § 70.030(1) (sheriff "may appoint his or her own deputies and may revoke the

### 3. Plaintiff Raleigh's First Amendment Claim

To establish a First Amendment retaliation claim under § 1983, a plaintiff must prove (1) that he or she engaged in constitutionally protected conduct; (2) an adverse action by the defendant sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements—"that is, [that] the adverse action was motivated at least in part by plaintiff's protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010). If the plaintiff establishes her prima facie case, "the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (internal quotation marks omitted). "Summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* As discussed below, *infra* at III.B.3.a., an employer may also be entitled to summary judgment by demonstrating "that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

"Generally, in the First Amendment context, a defendant's motivation for taking action against the plaintiff is . . . a matter best suited for the jury." *Benison*, 765 F.3d at 661 (internal quotation marks omitted). This is because "in cases in which a defendant's state of mind" is in issue, plaintiffs "must primarily rely on circumstantial evidence and reasonable inferences drawn from the defendant's conduct." *Helwig v. Pennington*, 30 F. App'x 516,

---

appointment at his or her pleasure"). As a result, Maxey and Stevens have no property interest in their employment, *Bailey*, 106 F.3d at 141, and summary judgment is granted to Speck in his individual capacity on these claims.

518-19 (6th Cir. 2002) (citation and internal quotation marks omitted). The factual disputes that arise from circumstantial evidence and inferences from conduct often make summary judgment "inappropriate." *Id.* Indeed, "[s]ummary judgment is usually appropriate in state-of-mind cases only if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.*

Raleigh has produced sufficient evidence to raise genuine factual issues that must be presented to a jury. She argues that Defendant Jailer Moss retaliated against her because of her non-support for him and her support for another candidate for Jailer, Harris. (Doc. # 1 at ¶¶ 11, 13-14; Doc. # 38-1 at 18).[5] Refusal to support a political candidate, like support for a political candidate, is protected by the First Amendment because "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). After the election and victory by Defendant Jailer Moss, Raleigh was terminated. Therefore, Raleigh can easily establish the first two elements of her First Amendment retaliation claim. *Sowards*, 203 F.3d at 433.

The third element Raleigh must establish is a causal connection between her protected conduct and her termination. This can be shown "'through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action,'" *Benison*, 765 F.3d at 661 (quoting *Eckerman*, 636 F.3d at 209), "or demonstrating 'the disparate treatment of similarly

---

[5]     Although Raleigh alleged in her Complaint that she supported Plaintiff Stevens in the Jailer primary (Doc. # 1 at ¶ 13), in her deposition she explained that she supported Harris against Moss in the primary and believes that is why she was terminated. (Doc. # 38-1 at 18). "When a claimant's testimony contradicts the allegations in his complaint, we will credit his later testimony." *Leary v. Livingston Cty.*, 528 F.3d 438, 444 (6th Cir. 2008). The crux of Raleigh's claim is that she was terminated for supporting Defendant Jailer Moss's opponents in the primary and general elections. (*See* Doc. # 1 at 1-2, ¶ 11; Doc. # 38-1 at 18).

situated individuals,'" *id.* (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)).

Raleigh presents sufficient evidence to show that Jailer Moss knew she supported Harris in the primary contest and did not support him. Raleigh introduced herself to Moss at a campaign event and told him she worked at the jail, while wearing a red Harris for Jailer shirt. (Doc. # 38-1 at 18-19).[6] Raleigh has supported her showing of causation through temporal proximity between her support for Harris and her termination. *Eckerman*, 636 F.3d at 209. Raleigh campaigned for Harris during the primary in May of 2014. (*See, e.g.*, 38-1 at 18-19). Raleigh was terminated on January 5, 2015, approximately eight months after supporting Harris in the primary. At first glance, the temporal proximity between Raleigh's protected political conduct and her termination may appear too attenuated. However, Jailer Moss drafted Raleigh's termination letter when he was still Jailer-Elect, on December 29, 2014, and made her termination effective the very moment he took office. (Doc. # 35-1 at 12-13). Because Jailer Moss could not take adverse action against Raleigh until taking office, a reasonable juror could infer retaliatory motive from the fact that as soon as Moss had the authority to fire Raleigh, he did. Although by itself "a lag time of more than six months between protected conduct and an adverse action does not permit a strong causal inference," a reasonable jury could still find in Raleigh's favor on her First Amendment claim. *Benison*, 765 F.3d at 661.

In addition, there is circumstantial evidence that Raleigh's support for Harris was a motivating factor in her termination because another Harris supporter was also terminated

---

6    Raleigh also claims she supported Plaintiff Stevens as a write-in candidate for Jailer and former Sheriff Wood for Sheriff in the general election. (Doc. # 38-2 at 52-53; Doc. # 38-2 at 60-61). However, the evidence she has put forth, without more, does not allow a reasonable juror to infer that Jailer Moss knew Raleigh supported either Stevens or Wood.

by Jailer Moss. (Doc. # 38-1 at 32-33). By contrast, Jailer Moss retained Mark Hammond, a deputy jailer who was a supporter, even though Hammond had previously been arrested for domestic violence and incarcerated in his own jail. (Doc. # 35-3 at 108, 123-26, 148-49). Jailer Moss testified that he gave Hammond "the benefit of the doubt" when he retained him. (*Id.* at 126). Because there are sufficient factual allegations such that a reasonable jury could find a causal connection between Raleigh's political association and termination, she has established a prima facie claim.

Because Raleigh has established a prima facie case, the burden shifts to the Defendants to show by a preponderance of the evidence that Jailer Moss would have reached the same decision, even in the absence of Raleigh's protected conduct. *Eckerman*, 636 F.3d at 208; *see Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 US 274, 287 (1977). Whether Jailer Moss would have taken the same action if Raleigh had not supported Harris is an "issue[] of fact "that may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Boger v. Wayne Cty.*, 950 F.2d 317, 322-23 (6th Cir. 1991) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989)); *see also Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1037, 1056-57 (6th Cir. 2001) ("summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact").

Jailer Moss has failed to present evidence that is so one-sided that it requires summary judgment. To meet his burden, Jailer Moss claims that he terminated Raleigh because of Raleigh's role in the poor operation of the jail, her interpersonal problems, and because she left early from the training at the Jailer's Conference and falsified

documentation of her hours. (Doc. # 23-3). Raleigh contests these assertions and claims she was a good employee who was never written up, the training sessions were not mandatory, and that she recorded her time at training accurately. (Doc. # 38-1 at 43-47; Doc. # 38-2 at 140-42). Accordingly, Defendants have not established that the evidence is "so one-sided" that Raleigh would have been terminated, even in the absence of her protected conduct. *Boger*, 950 F.2d at 322-23.

### a. *Elrod/Branti* Exception

Defendants argue that even if Raleigh can show that she was fired because of her support for Harris, there is no constitutional violation (and therefore the first element of the retaliation claim cannot be met) because Raleigh's fiscal account manager position was one for which "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980). This is commonly referred to as the *Elrod/Branti* exception. "Whether political affiliation is an appropriate consideration for a government position is a question of law." *Sowards*, 203 F.3d at 435.

"The issue on summary judgment is whether Defendants have established that no genuine factual issue exists as to whether political affiliation may appropriately be considered with respect to the position in question." *Id.* (internal quotation marks omitted). The Sixth Circuit has identified four categories of positions for which political affiliation may be an appropriate consideration. *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996).[7] Defendants argue that Raleigh's position, fiscal account manager, falls into Category Two

---

7 Raleigh's position clearly does not fall into Category One ("positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted") or Category Four (positions that are filled by balancing out political party representation or selections by governmental agents or bodies). *McCloud*, 97 F.3d at 1557.

or Category Three. Category Two positions are ones that have been delegated a significant portion of discretionary policymaking authority, such as the deputy secretary of labor in a state. *Id.* Category Three positions are ones that belong to confidential advisors who spend a significant amount of time advising Category One or Two position-holders on how to exercise their policymaking authority, or who control lines of communication to those positions. *Id.*

"To determine whether political affiliation is an appropriate requirement[,] it is the inherent duties of the position itself *and* the duties as envisioned for the new holder which must be examined, rather than the duties as performed by the person holding the position at the time of the alleged violation." *Hager v. Pike Cty. Bd. of Educ.*, 286 F.3d 366, 372 (6th Cir. 2002) (citations omitted). Still, "a plaintiff's actual duties may nonetheless serve as evidence of the duties inherent in the position." *Feeney v. Shipley*, 164 F.3d 311, 320 (6th Cir. 1999). A description of the position can also be instructive. *Latham v. Office of Att'y Gen.*, 395 F.3d 261, 267-68 (6th Cir. 2005).

Specifically, Defendants argue that the fiscal account manager is a Category Two position because Raleigh "was granted meaningful input, if not complete discretion, over how the Jail would achieve its broader goals when she helped develop policy, wrote the inmate handbook, drafted and oversaw the budget, operated the Jail kitchen, designated training for new hires, manag[ed] jail expenses, including balancing the Jail bank account, and was involved in employee hiring. . . . "[F]ormer Jailer Harris placed a substantial amount of control over the Jail, its function, and direction in Raleigh's hands." (Doc. # 23-1 at 35). Alternatively, Defendants argue that the fiscal account manager is a Category Three position, a confidential advisor. Raleigh disagrees with Defendants' characterization

of the fiscal account manager position. While Raleigh admits that she "did give input" to Jailer Harris if asked, and "did all the billing," she claims that suggesting drug testing was "as close as [she] ever got to making policy." (Doc. # 38-1 at 43; Doc. # 38-2 at 81-82; Doc. # 38-4 at 173).

Many of Raleigh's duties deal with money–budgets, bills, accounting, and payroll. The extent of the fiscal account manager's budget discretion is relevant to the *Elrod/Branti* determination because "budgetary decisions are among the most significant, and the most political, actions which government officials take." *Blair v. Meade*, 76 F.3d 97, 100 (6th Cir. 1996). The fiscal account manager job description speaks of tasks that could be political, depending on the amount of discretion involved, such as "budget preparations" and "accountability for all revenues and disbursements for the jail fund," but also ministerial tasks like "obtaining purchase order numbers, then sending all outgoing bills to the fiscal court" that, while important, do not require the exercise of "discretion of *political* significance." *McCloud*, 97 F.3d at 1559; *compare Ray v. Davis*, 528 F. App'x 453, 460 (6th Cir. 2013) (preparing and presenting financial and tax reports to County Commission on behalf of County Trustee is inherently political); (Doc. # 23-17). General office tasks like overseeing inmate e-cigarettes and calling cards, scheduling employee work hours, signing up new employees for training, and tracking deputies missing work are also not indicative of a Category Two position. (Doc. # 23-1 at 9-10). Raleigh, in her position as fiscal account manager, could either be a ministerial employee with few discretionary functions, like a bookkeeper, or she could have budgetary and spending discretion and a significant amount of delegated authority. The facts are unclear.

Similarly, it is unclear whether Raleigh's duties fit within Category Three. In *McCloud*, the Sixth Circuit compared a Category Three position to "a judge's law clerk or legal secretary." 97 F.3d at 1557. The record is not sufficiently clear that Raleigh's position "involve[s] access to confidential and political material," or "controlling the lines of communication to the [Jailer]," both hallmarks of Category Three status. *Hager*, 286 F.3d at 375.

Furthermore, Defendants have offered no evidence about "the duties that the new holder" of the fiscal account manager position will perform–an important element of the *Elrod/Branti* analysis. *Faughender v. City of N. Olmsted*, 927 F.2d 909, 913 (6th Cir. 1991).[8] At this stage, the fiscal account manager's duties "remain too ill-defined for us to adjudicate the issue as a matter of law. . . . Because the dispute in this case stems from obscurities in the facts, not the law," denial of summary judgment is warranted. *Lane v. City of LaFollette*, 490 F.3d 410, 422-23 (6th Cir. 2007) (internal quotation marks and citations omitted). These obscurities and inconsistencies are actual issues that prevent summary judgment. Because the degree of budgetary discretion and the scope of policymaking authority inherent in Raleigh's position is unclear, summary judgment must be denied.

### 4. Maxey's First Amendment Claim

Richard Maxey asserts that he was not rehired because of his support for incumbent Sheriff Todd Wood. Maxey can meet the first two elements of the retaliation test–protected activity and adverse action, and Sheriff Speck does not contest these elements. (Doc. #

---

8    In response to a question about whether Raleigh was responsible for payroll as fiscal account manager, Jailer Moss admitted that during her interview, Raleigh "stated she did several jobs" but that " I really don't know which ones that she was assigned to." (Doc. # 35-2 at 84-85).

24-1 at 27). Supporting a political candidate is a protected activity under the First Amendment. *Sowards v. Loudon Cty.*, 203 F.3d 426, 432 (6th Cir. 2000) (internal quotation marks omitted). Maxey exercised that right when he supported Sheriff Todd Wood in the election. Sheriff Speck's refusal to rehire Maxey satisfies the second element. A "refusal to hire" is an adverse action in employment, *see Thaddeus-X*, 175 F.3d at 396, and Speck did not rehire Maxey to his previous position as a court security officer. (Doc. # 24-4 at ¶¶ 3, 9, 13).

However, the third element—the "causal connection" between Maxey's support of Sheriff Wood and Speck's refusal to rehire Maxey–requires more attention. Because Maxey produces enough evidence that would permit a reasonable juror to conclude that Sheriff Speck's refusal to rehire him was motivated in part by his support of former Sheriff Wood, Maxey has established a prima facie case for his First Amendment retaliation claim.

The "causal connection" element turns on Sheriff Speck's motivation in refusing to rehire Maxey. As evidence of motivation, Maxey has demonstrated "temporal proximity between engaging in protected activity and suffering an adverse employment action" by showing that Sheriff Speck refused to rehire him soon after Maxey supported Speck's opponent in the election. *Benison*, 765 F.3d at 661 (internal quotation marks omitted). Although approximately eight months elapsed between Maxey's support for Sheriff Wood and Sheriff Speck's decision not to rehire him, that lapse does not defeat causation. *Id*.

Additionally, Maxey has shown "disparate treatment of similarly situated individuals" by showing that Sheriff Speck instead hired his own supporters who were otherwise comparable to Maxey. *Id.* Sheriff Speck insists that Maxey cannot establish a causal connection between Maxey's political affiliation and Speck's refusal to rehire him because

he rehired seven employees who, like Maxey, supported former Sheriff Wood (including Wood's brother).[9] (Doc. # 24-10; Doc. # 24-11; Doc. # 24-12). However, those employees are not similarly situated to Maxey because they occupied different positions–two were narcotics detectives (Doc. # 24-10; Doc. # 24-13), and two were deputy sheriffs. (Doc. # 24-11; Doc. # 24-12).

Moreover, the fact that some Wood supporters were rehired does not automatically justify summary judgment. Maxey need not prove that political association was the *sole* reason for his discharge. Instead, he must show that political association was a *motivating factor* in his discharge—"that is, the adverse action was motivated *at least in part* by [Maxey's] protected conduct." *Eckerman*, 636 F.3d at 207 (emphasis added). That Sheriff Speck rehired other Wood supporters may be relevant to, but is not dispositive of, Speck's motivation with respect to Maxey.[10]

Maxey has further shown that Sheriff Speck treated him differently from similarly situated individuals—other applicants who are like Maxey in "relevant aspects," including applicants with allegations of previous misconduct and those applying for positions as court

---

9   Although Defendants identify seven individuals who supported Wood who were rehired, they do not provide any evidence that Sheriff Speck knew of the support of four of the individuals (*see* Doc. # 37-1 at 42). As a result, Speck's retention of those four individuals does not undermine Maxey's causal link.

10  Defendants assert that "where the candidate-elect retains the majority of employees who supported an incumbent candidate, the element of causation is not met." (Doc. # 51 at 3). They cite two sentences of *Hall v. Tollett*, 128 F.3d 418, 424-25 (6th Cir. 1997) in which the court explained that a defendant who assumed the incumbent's employees opposed him, and only fired nine of sixty-four, "cannot establish that supporting the incumbent in the primary was the reason for their discharge." *Id.* The court did not apply the three-element test above, but instead noted that "[t]he plaintiff [carries] the initial burden of proving that he or she was discharged *because of* his or her political affiliation." *Id.* at 423 (emphasis added). As a result, the "majority rule" Defendants propose is not persuasive. Even if it were, Defendants have no analogy here, because there is no evidence that Moss assumed all of Wood's employees opposed him or that he retained a majority of Wood supporters.

security officers.[11]  For example, Misty Pitman was hired as a court security officer by Sheriff Speck, despite being terminated from her previous job after an altercation with her husband at the Sheriff's Office.  (Doc. # 33-2 at 28-29 ("she alleged that he smacked her, she smacked him")).  Sheriff Speck knew of Pitman's past termination (*id*.), but he also knew that Pitman was "a pretty big supporter" of his.  (Doc. # 33-1 at 49-50; Doc. # 33-2 at 51).  Unlike Maxey, Pitman had no previous law enforcement experience.  (Doc. # 33-1 at 47).  Charles Boston, who had been charged with fourth-degree assault, domestic violence, was also hired as a deputy sheriff by Sheriff Speck.  (Doc. # 33-2 at 62, 66).  Speck knew of the past charge at the time he hired Boston.  (*Id*.)  The charges had been dropped when Speck hired him, but they were later reinstated.  (*Id*.)  By contrast, Speck had no reason to believe that Maxey had been charged with any crime.  (*Id.* at 63).  Based on these similarly situated individuals, a reasonable juror could find that if Maxey had not supported former Sheriff Wood, he could have been treated like Pitman or Boston–he could have been rehired.

Although Sheriff Speck argues that he would have taken the same action even if Maxey had not supported former Sheriff Wood, the record is not so "one-sided" as to justify summary judgment.  *See Boger*, 950 F.2d at 322-23.  Specifically, Sheriff Speck asserts

---

11    Maxey resigned from a previous job because of a sexual harassment allegation.  (Doc. # 37-1 at 45).  He was also suspended for two weeks from his job at the Somerset Police Department for using the women's bathroom and denying it.  (*Id.* at 43-44).  The other applicants are not identical to Maxey, but they are similar in that they have allegations of previous misconduct or applied for the same position.  The Sixth Circuit does not require Maxey to show "an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'; rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  "However, when the sample size of possible comparable employees is small, a court should not apply the 'similarly-situated' requirement so stringently that it deprives a plaintiff of any remedy to which he may be entitled under the law."  *Benison*, 765 F.3d at 662.

that Maxey's history of inappropriate sexual conduct during previous employment, poor interview, and reports of poor performance establish that he would not have been rehired, even if he had not supported Wood. But Maxey challenges this assessment of his work performance, asserting that he has had no disciplinary issues while employed by the Sheriff's Department for the past three years, that he is a prompt and dedicated worker, and that he has received no complaints and several compliments on his job performance. (Doc. # 37-1, 12-14; Doc. # 37-2 at 62-63). In fact, a few months before he was discharged, Maxey was offered and accepted a full-time position. (Doc. # 37-1 at 14-15).

As discussed above, Sheriff Speck's purported concern about Maxey's history of misconduct is undermined by the fact that he hired a supporter who had a similar history of misconduct. (Doc. # 33-3 at 129). Viewing the facts in the light most favorable to Maxey, there is a genuine issue about whether Sheriff Speck would have hired Maxey if he had not supported former Sheriff Wood, and thus, summary judgment is inappropriate.

### 5. Plaintiff Stevens's First Amendment Claim

Like Maxey, Stevens can establish the first two elements of a retaliation claim. Stevens supported former Sheriff Wood for Sheriff and himself for Jailer, and those political associations are constitutionally protected. *Sowards*, 203 F.3d at 432. After engaging in this protected activity, Stevens was not rehired by newly elected Sheriff Speck. *Thaddeus-X*, 175 F.3d at 386.

Stevens claims he was retaliated against for his support of Sheriff Wood and his own candidacy for Jailer. However, "the defendant must have known about the protected activity in order for it to have motivated the adverse action." *Thaddeus-X*, 175 F.3d at 387 n.3. Here, Defendants argue that Sheriff Speck was unaware of Stevens's activities in

support of former Sheriff Wood and only aware that Stevens was campaigning for himself. (Doc. # 33-1 at 34).  In response, Plaintiffs point to Stevens's testimony that he always spoke with Sheriff Wood at political events, and that he always supported Sheriff Wood during his campaigning.  (Doc. # 36-2 at 87).  Stevens also spoke to Sheriff Speck at one event, though the conversation was short.  (Doc. # 36-1 at 35-36).  Drawing all reasonable inferences in favor of Stevens, a reasonable jury could find that Sheriff Speck knew of Stevens's support for former Sheriff Wood.

To establish the causal link between Stevens's political activity and Speck's failure to rehire him, Stevens also argues that Sheriff Speck and Jailer Moss were "political allies." (Doc. # 36-1 at 36-37).  Stevens explains that at campaign events, Jailer Moss and Sheriff Speck "worked the crowd together, handed out cards together," and had their election night party at the same place in May 2014.  (*Id.*; Doc. # 35-5 at 107).  Jailer Moss explained that at events, he and Sheriff Speck shook hands, passed out cards, talked to people while standing beside one another, and that both had their campaign celebration at Moody Farms.  (Doc. # 35-3 at 105-06).  Jailer Moss also confirmed that he supported Sheriff Speck in the election.  (*Id.* at 104).  Taking these facts in the light most favorable to Stevens, a reasonable juror could infer that Sheriff Speck supported Jailer Moss.  Whether Sheriff Speck and Jailer Moss were formal "political allies" is irrelevant to Stevens's claim–the First Amendment protects individuals from adverse action based on the political candidate they support, regardless of whether that candidate directly competed for votes against the person who retaliates.

Stevens has also shown close temporal proximity between his protected action and Sheriff Speck's refusal to rehire him.  Stevens, despite losing to Jailer Moss in the Jailer's

primary, ran as a write-in candidate in the general election in November. (Doc. # 36-1 at 22). Sheriff Speck took office as Pulaski County Sheriff on December 27, 2014. (Doc. # 24-6 at 4). Stevens was not rehired as of January 1, 2015. (Doc. # 36-1 at 10). The two month period between Stevens's campaign for Jailer and Sheriff Speck's refusal to rehire him is "close temporal proximity that is suggestive of retaliation." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283-84 (6th Cir. 2012) (finding that a two-month gap between a protected activity and an adverse action "suffice[s] in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge"); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding a causal link when plaintiff was terminated "three months after [she] requested [medical leave from work], and [on] the very day that she was scheduled to return"). Indeed, Sheriff Speck took adverse action against Stevens less than a week after becoming Sheriff.

In addition, there is evidence of similarly situated applicants being treated differently that could permit a reasonable jury to drawn an inference of retaliation. *Benison*, 765 F.3d at 661. As discussed above, Sheriff Speck hired Charles Boston, who had been charged with fourth-degree assault, and Misty Pitman, who lost her job after an altercation with her husband in the Sheriff's office. (Doc. # 33-2 at 62-66; Doc. # 33-1 at 28-29; Doc. # 33-2 at 51). Although Sheriff Speck claimed that Stevens was under investigation, he did not know of any criminal charges against him. (Doc. # 33-2 at 63; Doc. # 24-4 at ¶ 16). Therefore, Sheriff Speck's argument is weakened by the fact that he hired supporters who had similar, or perhaps worse, disciplinary histories.

Because Stevens established a prima facie claim of retaliation, the burden shifts to Defendants to show by a preponderance of the evidence that Sheriff Speck would have

taken the same action even without Stevens's political activities. As explained above, because this question involves issues of fact, Speck may only prevail at summary judgment if the evidence is completely "one-sided." *Boger*, 950 F.2d at 322-23. It is not.

Sheriff Speck maintains that he had several non-political reasons for not rehiring Stevens, culminating in his opinion that "Stevens was not trustworthy, did not perform well as a narcotics detective, was not following appropriate police protocol in developing informants and/or charging felony offenders, was not the caliber of candidate [he] wanted to work as part of the Sheriff's Office, and that other law enforcement agencies had difficulty working with him." (Doc. # 24-4 at ¶ 22). In particular, Sheriff Speck stated that during Stevens's interview, Stevens "indicated that he would, of his own volition and discretion, choose not to charge [individuals who purchased drugs] in exchange for information." (Doc. # 24-4 at 20). In further support, Sheriff Speck notes that Stevens's partner and fellow narcotics detective Damon Kegley supported former Sheriff Wood and Stevens for Jailer, but was rehired. (Doc. # 24-10 at ¶ 3). Deputy Sheriff McCollum, who ran for Jailer against Jailer Moss, was also rehired by Speck, although he did not continue his campaign in the general election. (Doc. # 24-12).

Stevens denies knowledge of any work deficiencies, including any problems with other law enforcement agencies. (Doc. # 36-1 at 43-47). He states that he was one of the most well-trained deputies in the department who received compliments from the public for his work. (Doc. # 36-2 at 58, 67). He also claims that Hancock, Speck's Chief Deputy, has used his cases to teach other police officers. (Id. at 54-55). Upon review of the record, the Court concludes that a fact issue remains about whether Speck would have fired Stevens absent his protected conduct.

### 6.    Qualified Immunity

Government officials sued in their individual capacities are shielded by qualified immunity.  Qualified immunity may be overcome, however, if a plaintiff can show that a constitutional right was clearly established at the time of the alleged misconduct and that the officer's conduct amounts to a constitutional violation.  *Pearson v. Callahan*, 555 US 223, 231 (2009).  The two prongs may be addressed in either order.  *Id.* at 236.  As demonstrated above, it is alleged that the Defendants' conduct amounts to violations of the First and Fourteenth Amendments, so the question that remains is whether the constitutional rights at issue were clearly established.[12]

### a.    Defendant Jailer Moss

Jailer Moss is not entitled to qualified immunity on Raleigh's Fourteenth Amendment due process claim.  It was clearly established at the time he terminated Raleigh that "[t]he tenured public employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story" prior to termination.  *Loudermill*, 470 U.S. at 547.  Nor is Jailer Moss entitled to qualified immunity on Raleigh's First Amendment claim.  The constitutional right to political association was clearly established when Jailer Moss terminated Raleigh.  *Sowards v.*

---

12    Plaintiffs claim that Sheriff Speck and Jailer Moss acted in bad faith, which prevents any protection from qualified immunity, citing *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001).  (*See* Doc. # 45 at 39; Doc. # 46 at 39).  *Yanero* has no bearing on qualified immunity here.  In *Yanero*, the Supreme Court of Kentucky held that state officials sued in their individual capacity receive qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."  65 S.W.3d at 522.  That standard is not the same as qualified immunity under § 1983, which does not include a subjective component.  *Harlow v. Fitzgerald*, 457 US 800, 816-18 (1982).

*Loudon Cty.*, 203 F.3d 426, 432 (6th Cir. 2000) ("Support of a political candidate falls within the scope of the right of political association.").

Jailer Moss urges that he is entitled to qualified immunity on the First Amendment claim based solely on Raleigh's interview. Specifically, Jailer Moss claims that Raleigh made her position sound like one for which political association is a permissible motive for discharge, and thus it was reasonable for him to fire her, despite the factual disputes in the record. That misstates the doctrine of qualified immunity.

Jailer Moss "is entitled to qualified immunity only if the law is unclear, not the facts." *McCloud v. Testa*, 227 F.3d 424, 432 (6th Cir. 2000). The law is clear that the *Elrod/Branti* exception turns on the inherent duties of the position and the duties as envisioned for the new holder, not the duties performed by the person holding the position. *Hager*, 286 F.3d at 372. As outlined above, there are factual disputes about the inherent duties of the fiscal account manager position, including the degree of policymaking authority and ambiguity regarding budget discretion. And there is no evidence of "the duties as envisioned for the new holder" of the position, which "must be examined" to determine whether an *Elrod/Branti* exception applies. *Id.*

"Whether a party is entitled to qualified immunity is typically a question of law for the court to decide." *Everson v. Bd. of Educ.*, 123 F. App'x 221, 228 (6th Cir. 2005). "When the facts on which the question of immunity turns are in dispute, however, it is for the trier of fact to make the factual findings underlying resolution of the qualified immunity issue." *Id.* Simply put, the Court cannot "determine whether the law clearly established the illegality of Plaintiff's termination without further factual development." *Lane*, 490 F.3d at

422 n.3. "Stated alternatively, the undisputed facts presently before the Court do not allow us to grant qualified immunity to Defendants as a matter of law." *Id.*

###### b.    Defendant Sheriff Speck

Similarly, Sheriff Speck is not entitled to qualified immunity on Maxey's or Stevens's First Amendment retaliation claims.  The constitutional right to political association was clearly established when Speck refused to rehire Maxey and Stevens.  *Sowards*, 203 F.3d at 432.

Sheriff Speck claims that he is entitled to qualified immunity because a reasonable official in his position would understand that the First Amendment is not violated when there is no causal connection between a protected activity and a refusal to rehire, or where similarly situated employees were rehired.  That does not entitle Sheriff Speck to qualified immunity where, as here, the Court has denied summary judgment because a jury could find that there *is* a causal connection between the protected conduct and adverse action. To argue that Sheriff Speck is entitled to qualified immunity because someone in his position could reasonably believe that there was no causal link "is an attempt to transform the factual issue of motivation into the legal question of objective reasonableness." *Hoard v. Sizemore*, 198 F.3d 205, 218 (6th Cir. 1999).  "Such an approach would immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." *Id.*  In fact, this approach has been specifically rejected by the Supreme Court. *See Crawford-El v. Britton*, 523 U.S. 574, 593-94 (1998); *see also Hoard*, 198 F.3d at 218. "As long as plaintiffs produce evidence that support a finding that [Speck] discharged them on the basis of their political affiliation," and the right to political affiliation was clearly

established (and it was), the Court is obligated to deny a motion for summary judgment on qualified immunity grounds. *Id.* at 219.

### C. Plaintiffs' Constitutional Claims Against Pulaski Fiscal Court

The Pulaski County Fiscal Court moved for summary judgment on all claims against it, arguing that it "does not and cannot control the employment decisions or actions of" Defendants Sheriff Speck and Jailer Moss. (Doc. # 23-1 at 38-39; Doc. # 24-1 at 38-39). Plaintiffs responded that "Mr. Stevens and Mr. Maxey, as former employees of the Sheriff's Department, do *not* pursue the following claims: Fourteenth Amendment due process claims against Pulaski County, the Pulaski County Judge Executive and Fiscal Court[,] and First Amendment claims against Pulaski County, the Pulaski County Judge Executive and Fiscal Court." (Doc. # 46 at 5). Plaintiffs having declined to pursue these claims, the Court will grant summary judgment to these Defendants.

Therefore, the only remaining claims against the Fiscal Court are based on Raleigh's First and Fourteenth Amendment claims against Defendant Jailer Moss in his official capacity for terminating her employment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

Although there is no *respondeat superior* liability for local governments under § 1983, *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978), counties can be liable in certain circumstances. One of those instances is "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). "[I]t is plain that

municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480.

Whether a particular official has final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Under Kentucky law, the power to appoint and remove county jail personnel lies with the county Jailer. Ky. Rev. Stat. Ann. § 71.060(2); (Doc. # 23-1 at 38-39). As a result, Raleigh's termination was an exercise of final decision making authority, and the Pulaski County Fiscal Court can be sued for Raleigh's § 1983 claims. *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117-18 (6th Cir. 1994) (holding that a municipality was liable because the "decision to punish [plaintiff] for exercising his constitutional rights was made by the 'government's authorized decision makers'"); *Whittle v. Floyd*, 202 F.3d 271, 1999 WL 1336078, at *3 (6th Cir. 1999) (unpublished table decision) ("Because the Fiscal Court was not the final policymaker, the plaintiffs were not required to prove any act or omission on the part of the Fiscal Court. Rather, [the final policymaker's] actions could be attributed directly to the county, without any showing of ratification by the Fiscal Court. The plaintiffs could therefore recover from the county simply by proving that [the final policymaker's] personnel decisions were unconstitutional."). For that reason, the Fiscal Court's Motion for Summary Judgment is denied with respect to Raleigh's claims.

IV.    **CONCLUSION**

Accordingly, **IT IS ORDERED** as follows:

(1)    Defendants' Motion for Summary Judgment (Doc. # 23) is **denied in full**, as set forth herein; and

(2)     Defendants' Motion for Summary Judgment (Doc. # 24) is **denied in part** and **granted in part**, as set forth herein.

(3)     As set forth herein, the following claims remain to be adjudicated:

     a.     Raleigh's First Amendment claim against Moss and the Fiscal Court;

     b.     Raleigh's Fourteenth Amendment claim against Moss and the Fiscal Court;

     c.     Maxey's First Amendment claim against Speck;

     d.     Stevens's First Amendment claim against Speck;

     e.     Raleigh's wrongful discharge claim against Moss;

     f.     Maxey's wrongful discharge claim against Speck; and

     g.     Stevens's wrongful discharge claim against Speck.

(4)     **Within twenty (20) days from the date of entry of this Order**, the parties shall meet and confer and file a Joint Status Report regarding their willingness to participate in a court-facilitated settlement conference, and setting forth proposed dates for a final Pre-Trial Conference and Trial.

This 30th day of September, 2016.



Signed By:

_David L. Bunning_

**United States District Judge**